ANNA C. DOOLEY vs. BOSTON ELEVATED RAILWAY
COMPANY.

Suffolk.   November 12, 13, 1908. — March 6, 1909.

Present: KNOWLTON, C. J., MORTON, HAMMOND, BRALEY, & RUGG, JJ.

*Damages*, In tort.

In an action against a corporation operating a street railway, for personal injuries
from a collision of a car of the defendant, in which the plaintiff was being trans-
ported as a passenger, with another car of the defendant, from the evidence
upon the question of damages, it appeared that the plaintiff was a young woman,
who before the accident was healthy both in body and mind and cheerful in tem-
perament and after the accident had become an invalid and morose and was
subject to fits or spasms, during which she was more or less unconscious.
There was evidence which would have warranted a finding that, by a proper
and reasonable use of such will power as she had, the plaintiff could lessen
the fits or spasms by improving her general tone, and that, if she resisted
the impulse and did not "let go of her feelings," she could control the fits or
spasms to a certain extent.   The defendant asked the judge to instruct the jury
that they "must eliminate from consideration such of the plaintiff's symptoms
or demonstrations, if any, as could have been prevented by the exercise of such
control as the plaintiff was capable of at the time of such symptoms or demon-
strations," and also to instruct them as follows : "If the jury believes that the
plaintiff has had fits, spasms, or spells, since the accident, and if the jury also
believes that the coming on of such fits, spasms or spells was always or some-
times under the plaintiff's control in the sense that she could by the exercise of
the will power or self control of which she was capable have always or some-
times prevented them from happening, had she wished to do so, then so far as
that was the case she cannot recover for fits, spasms, or spells so preventable, or
for their consequences."   The judge refused to give these instructions, and the
jury returned a verdict for the plaintiff, assessing the damages in a large sum.
On exceptions alleged by the defendant, it was *held*, that these instructions
should have been given, and that there should be a new trial on the question of
damages only.

HAMMOND, J.   This was an action for personal injuries alleged
to have been received by reason of a collision between two of the
defendant's cars, in one of which — a long open car — the plaintiff
was being transported as a passenger.   At the trial there seems
to have been no question as to the due care of the plaintiff or neg-
ligence of the defendant, but there was a stubborn and prolonged
contest over the question of damages,* many witnesses, includ-

---

* In the Superior Court the case was tried before *Bond*, J.   The jury
returned a verdict for the plaintiff in the sum of $11,000.

ing medical experts, having been called on each side. The case is before us upon exceptions of the defendant arising out of this branch of it.

There was ample evidence that the plaintiff before the accident was a well, cheerful woman, and that after the accident she lost flesh and was morose and subject to fits or spasms, during which she was more or less unconscious ; and the jury might have found that these spasms came upon her unexpectedly, that they were convulsive, that they lasted generally from three to ten minutes and infrequently as long as twenty-five minutes, that she had had them ever since the accident, and that they had been quite frequent, two of the plaintiff's aunts testifying that she had hundreds of them, and her physician testifying that she might have from two to fifteen a day, varying in severity, and that sometimes she would go four or five days without having any. Of course the medical experts differed as to what was the nature of the disease from which the plaintiff was suffering. Those called by the plaintiff said it was traumatic hysteria, while of those called by the defendant one thought it was a nervous condition somewhat hysterical, and the other that it was not hysteria at all. One of the questions was whether the plaintiff could control these fits or spasms, and if so to what extent. There was evidence from which the jury might have found that when in the water bathing or swimming, or when in any other place where a fit or spasm might be accompanied by unusual danger, the plaintiff did not have fits, or at least did not have them so frequently. The testimony of the medical experts upon the point may be summarized as follows : Dr. Keenan, the attending physician, called by the plaintiff, testified that he had given no special study to hysteria or nervous disorders " any more than to any other human ailment," that he " had had something to do with neurasthenia and hysteria, and also in connection with litigation ; that he had not found that there was any tendency on the part of the plaintiff to exaggerate in cases of hysteria " ; and on being asked on cross-examination whether he was not familiar enough with the subject of hysteria to form an opinion as to " what extent these so-called fits or spells are voluntary, and to what extent involuntary," he answered in the negative.

Dr. Putnam, who had attended the plaintiff a few times, one of which was on the day of the injury, and who was an expert on diseases of the nervous system, testified on cross-examination that he thought " these spasms are not connected with the will, but generally sub-conscious; they indicate that the will has lost its controlling power in the sense of co-ordinating power; . . . and that the general rule in litigated cases is that after the termination of litigation there is an improvement and sometimes a recovery; . . . that simulation of symptoms is not a characteristic of traumatic hysteria, but that in cases of traumatic hysteria where there is litigation it is his practice to watch for the simulation of symptoms, and there is good reason for that practice." In answer to a question whether " there is a tendency, in cases of traumatic hysteria, where there is litigation, for the patient before the suit is settled to create to a certain extent . . . certain classes of symptoms," he said, " I don't think they create them."    And in reply to the question whether he could form an opinion from what he had observed of the plaintiff " whether or not the occurrence or severity of every one of the spasms was to any extent controllable by " her, he said, " I think that any influence exerted on the general mental attitude would help to prevent the spasms."    Upon being asked to explain more fully, he used the following language: " What I meant to say really was this: That in a general way these spasms occur without reference to the condition of the person's volition ; that is the reason I wanted to call attention to the hallucinations she has.    They occur under circumstances that recall the circumstances under which they first occurred.    That is to say, under the conditions of fright or vague memory of fright, and, therefore, they are what are called sub-conscious.    It is also true that if a person tries his best to keep his mind in a healthy state he is less likely to have such conditions come on.    I do not think the person can control the individual spasms unless they are slight ones — perhaps mitigate them if they don't lose their consciousness; but they can help control them by improving their general tone."

Dr. Knapp, the plaintiff's last expert witness, testified that he should not say that in cases of hysteria there was malingering, " but of course in litigation malingering might be very possible ";

and he defined malingering as an " attempt on the part of a person to simulate a disease which . . . [he has] . . . not," or " an attempt to simulate normal symptoms of a disease." He added that it was possible for a person under apt advice and instructions to simulate some systems of hysteria, but that there could be no simulation as to " reflexes." On redirect examination he said he had not found any evidence of simulation on the part of this plaintiff.

The defendant called two medical experts, Dr. Lothrop and Dr. Baldwin. Dr. Lothrop, when asked in the form of a hypothetical question, based upon the testimony of the plaintiff's witnesses as to the fits or spasms, " whether those spells were controllable by the will if she had a sufficient motive to control them," answered as follows: " It is awful hard to say . . . people can put on spells — people can have real attacks, and from what I know myself of her [the plaintiff] I cannot say. People can malinger, and it is hard to say whether they are malingering or not. I would say that spells which are the result of hysteria must show at the same time or other — you must see in the patient's condition the regular signs due to hysteria [naming some of the most characteristic signs]. . . . Now, if in the presence of those things [those characteristic things] you get attacks like what you have described, I should say those were real hysterical attacks. If you had attacks which came on, and when the patient was by herself or in special places, not in public, or under particular conditions without the regular hysterical signs, I should say those were more apt to be put on." On cross-examination he testified that the fact that she had no fits while dancing indicated that she had control of herself at these times, and " didn't let go of her feelings." On re-direct examination he testified in substance : " That he simply meant the statement given to me as to when and where she has had these attacks, shows that she has a certain control over herself, and that she does not seem to have these attacks in places where she would be injured or hurt ; and my statement in reference to her having attacks under certain circumstances refers to certain examinations if she was excited by the doctors, or by other people, she could have such attacks that would not hurt her. Referring to the church, she could have one in church or not, and when I speak of witnesses being

present, if inclined to malinger she could have attacks if there were people around who could testify to the attacks.   I do not say that she had done that, but it is a thing that does come up now and then."

To Dr. Baldwin the following question was put by counsel for the defendant: " Suppose . . . during the last three years since the accident . . . she [the plaintiff] has had a great number of these spells [such as you saw the other day], some less, and as long as five minutes, some fifteen, although she has been in bathing, and in swimming, jumped off a raft above her depth; although she has been living in the city in the winter since that time, and has been about the city from place to place on the street, and at no time has she ever had one of these spells in such a position that she was in bodily peril, that such spells as she has had have been either in safe places or with her people around to watch her, or in her own house sitting down — now, that is this case, and with the absence of these other marks you have mentioned, what conclusion can you draw as a medical man as to how much of the coming on of these spells is within her control ? "   To which question he answered : " I think that you would be forced to believe that to a certain extent they were under some control.   That as a rule hysterical patients do not hurt themselves in spells and sometimes they do; that in true hysteria the extent to which attacks are under the patient's control differs in different patients, but in this case the spells seemed to him more of ' a nervous demonstration that would be more under one's control than a serious attack in true hysteria '; that the knowledge of the pendency of the lawsuit would have. an unfavorable effect upon the plaintiff ; that he should expect the plaintiff would recover when the lawsuit was over, in the course of a year."   He further testified that he had no way of knowing what was going on in the plaintiff's mind, or whether she was exaggerating her symptoms or not, or " to what extent the plaintiff's symptoms indicated sickness," or " to what extent they did not indicate real sickness."   That he had seen cases " where there were very apparent nervous demonstrations that were not real," and " other cases where they were real, and in certain cases it is impossible to distinguish between them ; that is you cannot tell what a person has in mind, whether they are

compelled always, or whether it is not more or less voluntary." He further testified that " the fact that they [the spells or fits] always took place in places of safety would indicate to a certain extent that they were under the control of the patient, because if uncontrollable they would occur in other places."

While it may be conceded that this evidence of the experts as to the power of the plaintiff by a general course of life to lessen these spells or to control them in any degree, was, taken as a whole, not very illuminating, yet it would have warranted a finding that by a proper and reasonable use of such will power as the plaintiff had she could lessen these spells by improving her general tone ; and further, that if she resisted the impulse and did not " let go of her feelings," she could control them to a certain extent.

In this state of the evidence the defendant asked the judge to give the following instructions : " 7. If under the instructions of the court the jury finds that there was such physical injury in this case as to permit the recovery of damages for mental suffering or disease also, then in determining the damages to be awarded for mental suffering or disease the jury must eliminate from consideration such of the plaintiff's symptoms or demonstrations, if any, as could have been prevented by the exercise of such self control as the plaintiff was capable of at the time of such symptoms or demonstrations. 8. If the jury believes that the plaintiff has had fits, spasms, or spells since the accident, and if the jury also believes that the coming on of such fits, spasms, or spells was always or sometimes under the plaintiff's control in the sense that she could by the exercise of the will power or self control of which she was capable have always or sometimes prevented them from happening, had she wished to do so, then so far as that was the case she cannot recover for fits, spasms, or spells so preventable, or for their consequences."

These instructions were applicable to a possible view of the evidence which the jury might take, and it is not argued by the plaintiff that they are not correct in law ; nor could their general accuracy be successfully questioned. *Ingraham* v. *Pullman Co.* 190 Mass. 33, and cases cited. The judge did not give the instructions requested, but upon the subject instructed the jury as follows : " Now there is a matter here that is of consider-

able consequence, and that is with reference to the convulsions, the fits or spells or spasms, as they have been called, and those have been described by different witnesses, so you have some idea of what they were. The question might be whether any such convulsions or any conditions that she was in at such times, whether there was a loss of consciousness, whether entire or partial; whether there was any pain or any suffering in consequence of the convulsions. Whether they were voluntary, whether they were involuntary, that is, whether she could have a fit or not just as she liked to and wanted to—that is what is meant by it,—that she need not have them unless she wanted to, and she could have one when she wanted — whether they were voluntary or involuntary. Or whether they would take her when she did not know they were liable to — she didn't know how long she would remain in one of them, and she had no control over them. Of course if you say that these convulsions, these fits, these spells, were entirely under her own control, and that she need not have one unless she saw fit to, and she had it because she wished to, then those should not be taken into account so far as she could avoid them, whether they caused suffering or not — that was a matter of her own choice."

We do not think that this part of the charge fairly covered the ground contained in the requests. The requests had reference not so much to the spells which, as described by the judge, she had " because she wished to," but to such " as could have been prevented by the exercise of self control," and there is a material difference between the two classes. The first more aptly describes a fit to which the active will of the victim contributes, the second a fit where there is no active exercise of the will to prevent it. The first implies an active exercise of the will, the second simply a sluggish inaction, a negligent quiescence of the will. The instructions fairly covered the law as to the first class, but they utterly ignored the law as to the second class.

And it is to be observed that this omission was material on what may be regarded as a tender spot in the case ; a spot where the jury would be likely to sympathize keenly with the plaintiff. Upon all the evidence the plaintiff was in a condition likely to appeal to a jury. A young woman, healthy both in body and in

mind, and cheerful in temperament, had become an invalid and morose, and she was seeking to hold the defendant responsible for this change. Under these circumstances it was the right of the defendant to have defined with precision the legal limits of its responsibility. In presenting these requests to the judge it was seeking for such definition, and seeking it in the only available way. If the defendant after hearing the charge had lain by and said nothing, it might have been argued with some degree of plausibility that while the rulings requested were not given in their precise form, still the judge had said something upon the general subject to which they alluded, that he evidently had them in his mind, and that if the defendant desired more specific instructions it should have called the attention of the judge to the omission in the charge, so that the judge might have an opportunity to correct it if inadvertently made. But at the close of the charge the defendant called the attention of the judge to the precise point now insisted upon, in the following language: " And especially counsel for the defendant desires to call attention of the court to the point that the so-called fits might be under the control of the plaintiff, without its being necessary to assume that she voluntarily brings them on. The court several times intimated to the jury that the defendant claimed the fits were under her control, that she not only did not resist the impulse, but actually brought them on. Counsel's point in the argument has been that she could control them, preventing them from coming on and not necessarily that she brought them on, although that may be a different argument. It was not the argument made, and I believe an injustice has been done to the defendant, owing to that portion of the charge, as a statement of fact." The judge refused to modify or change the charge.

It thus appears that the requests were correct in law and were applicable to a certain view of the evidence which the jury might lawfully take ; that they were material and calcu lated to protect the rights of the defendant ; that they were not given either in form or in substance ; that in what the judge said there was an important omission prejudicial to the defendant; that at the close of the charge the defendant clearly pointed out the omission ; and that the judge refused to supply the omission.

It seems clear that the defendant's rights have been prejudiced, and that without its fault.  The exceptions to the refusal to give the seventh and eighth requests must be sustained.

Inasmuch, however, as these exceptions bear only on the matter of damages, the verdict is to stand so far as respects the question of liability ; and there is to be a new trial on the question of damages only.

*So ordered.*

*W. G. Thompson & S. H. E. Freund,* for the defendant.
*J. E. Cotter,* for the plaintiff.

